
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KEVIN SROGA, | ) |
| Plaintiff, | ) Case № 1:11-cv-02124 |
| vs. | ) Judge Matthew F. Kennelly |
| | ) Magistrate Judge Sheila M. Finnegan |
| CPS-CHIAGO PUBLIC SCHOOLS: and | ) |
| Ronald Huberman, Marisa Velasquez, Juan | ) |
| Carlos Michel, James Sullivan, James | ) |
| Bebley, James Ciesil, James Seaberry, | ) COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS |
| Andres Durbak, Neil O'Connell, Cheryl | ) |
| Colsten, and John and Jane Doe(s) | ) |
| Individually, and THE CHICAGO BOARD | ) |
| OF EDUCATION, A MUNICIPAL | ) |
| ORGANIZATION CREATED AND | ) JURY TRIAL DEMANDED |
| MANAGED BY THE CITY OF CHICAGO, | ) |
| Defendants. | ) |

---

# CIVIL COMPLAINT

***Now Comes the Plaintiff*, KEVIN SROGA**, who complains as follows:

## NATURE OF CLAIM

1.    This Civil action is being brought pursuant to the violations of the United States

Constitution and the laws enacted thereunder seeking damages against these

Defendants, more specifically, under the Civil Rights Act of 1871 (42 U.S.C. Section

1983) and its jurisdictional counterpart of 28 U.S.C. 1343 to redress deprivations of

Civil Rights that Plaintiff had sustained that were accomplished by acts and or

omissions that Defendants committed while acting under color of state law during the

course of their employed activities working for an established municipal corporation

created, established, organized and ran by the City of Chicago's schooling system

commonly known as CPS- that violated Plaintiff's securities and immunities granted

to him under the Constitution of the United States and the laws enacted thereunder.

1

## JURISDICTION AND VENUE

2. Jurisdiction of this court is invoked pursuant to the Civil Rights Act, 42 U.S.C. sections 1983; the judicial code, 28 U.S.C. Sections 1343, 1331, and 1367(a); the Constitution of the United States; the Court's supplementary jurisdictional powers, the Illinois Constitution Article I Bill of Rights and Section 12 *Right to Remedy and Justice.*

3. Venue lies within the United States District Court, Northern District of Illinois, pursuant to 28 U.S.C. Section 1391, because all events or omissions giving rise to these claims occurred in this district.

## RELEVANT PARTIES

4. At all times herein mentioned, Plaintiff, KEVIN SROGA ("**SROGA**" or "Plaintiff") was and is now a citizen of the United States residing within the jurisdiction of this Court who was employed by CPS-Chicago Public Schools and the Board of Education as an Automotive Instructor for the City of Chicago's educational system that is a governmental agency created under and subject to Illinois State Law.

5. At all times herein mentioned, Defendant Ronald Huberman ("**HUBERMAN**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* who held the position of CEO for that organization who was in charge of, ran, supervised and or oversaw the daily operations of CPS- who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual capacity of CEO at this time only.

2

6.     At all times herein mentioned, Defendant Marisa Velasquez ("**VELASQUEZ**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* **"AKA"** The BOARD OF EDUCATION for the City of Chicago who acted under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in her individual and personal capacities.

7.     At all times herein mentioned, Defendant James Sullivan ("**SULLIVAN**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Inspector General's Office who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacities.

8.     At all times herein mentioned, Defendant Juan Carlos Michel ("**MICHEL**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Inspector General's Office who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education's schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States

3

and the laws enacted thereunder. This individual is being sued in his individual and personal capacities.

9.     At all times herein mentioned, Defendant James Bebley ("**BEBLEY**) was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Law Division whose official position was the *First Assistant General Counsel* for CPS or Head Counsel for CPS's Law Division who acted under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacities.

10.     At all times herein mentioned, Defendant James Ciesil ("**CIESIL** or *"AKA" THE HATCHET-MAN*") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations as the **Senior Assistant General Counsel** for CPS's Law Division who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacities.

11.     At all times herein mentioned, Defendant James Seaberry ("**SEABERRY"**) was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Law Division who was acting under color of state law as an employee, agent, or

representative for the City of Chicago's Board of Education schooling system, a known municipal organization of the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacity.

12. At all times herein mentioned, Defendant Andres Durbak ("**DURBAK**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Director of Safety and Security for CPS who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacities.

13. At all times herein mentioned, Defendant Neil O'Connell ("**O'CONNELL**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Security Manager of Safety and Security for CPS who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in his individual and personal capacities.

14. At all times herein mentioned, Defendant Cheryl Colston ("**COLSTON**") was employed by CPS-*CHICAGO PUBLIC SCHOOLS* Board of Educations Director of

Labor and Employee Relations at CPS who was acting under color of state law as an employee, agent, or representative for the City of Chicago's Board of Education schooling system, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities granted to him under the Constitution of the United States and the laws enacted thereunder. This Defendant is being sued in her individual and personal capacities.

15.     At all times herein mentioned Defendants employed by **CPS**-Chicago Public Schools-Board of Education Schooling System John and Jane Does ("**JOHN and JANE DOES**") were employed by Chicago Public Schools "**AKA**" The Chicago Board of Education and were acting under color of state law as employees, agents, or representatives for the Chicago Public Schools / Board of Education, a known municipal organization for the City of Chicago, that deprived Plaintiff of immunities and securities guaranteed to him under the Constitution of the United States and the laws enacted thereunder. These Defendants are being sued in their individual and or personal capacities.


### PLAINTIFF'S PERSONAL BACKGROUND AND STATEMENT OF FACTS

16.     Plaintiff is currently a 36 year old White Caucasian male currently residing in his life long neighborhood of the Humboldt Park Community in the City of Chicago.

17.     Humboldt Park is a 206 acreage park with the center of the park generally located approximately 1200 North (Division St.) and 3000 West (Sacramento Blvd.) within the confines of this City.

**18.** In addition to the Humboldt Park Community being home to the Plaintiff and his family, it's also home to such notorious and brutal street gangs such as the LK'S- Latin Kings, MLD's- Maniac Latin Disciples, SC's- Spanish Cobra's.

**19.** Plaintiff is not nor is any member of his family ever been associated with any member of any street gang that plagues Plaintiff's community.

**20.** Plaintiff is an educated individual who has defied all odds (thus far) concerning the street life that has plagued this one time beautiful Community.

**21.** In fact, within the past couple of years, Plaintiff's neighborhood has become increasingly worse with the violence and drug dealing transpiring throughout his neighborhood.

**22.** In fact, within the last two years or so, there have been roughly 23 incidents of persons being either stabbed, shot and or killed all within 100 yards or less of Plaintiff's front door steps.

**23.** Some of these instances had made the news and local headlines while majority of these incidents do not.

**24.** In essence, Plaintiff grew up and still resides in an environment which has been known for and labeled as a war zone.

**25.** During the years of 1994-2000, Plaintiff worked for the Chicago Park District while attending school as a college student at Triton community college and Northeastern University in Chicago majoring in Secondary Education.

**26.** Upon graduating college in 2000, plaintiff previously took, passed and was accepted into an apprenticeship program for I.B.E.W. Local 134 NECA-Technical

Institute for Union Electrician's of greater Cook County to train to become a Union Electrician.

27. Plaintiff further states that the I.B.E.W. - N.E.C.A. Technical Instiutue for Local 134 is one of the toughest trades to be accepted into without having the right clout or "phone call" to get in.

28. Plaintiff states he had no clout or "phone call" upon being accepted into this program.

29. Prior to being accepted and during Plaintiff's apprenticeship program, Plaintiff applied to several suburban law enforcement agencies as well as to the CPD.

30. During Plaintiff's apprenticeship, Plaintiff sustained a serious injury that ultimately forced plaintiff out of the trade and from ever working again as an electrician.

31. In 2001, while serving his apprenticeship (prior to be forced from the trade due to his injury), Plaintiff was offered an employment opportunity to serve on the Park Ridge Police Department as a PPO, Probationary Police Officer for that City.

32. For personal reasons, Plaintiff declined to accept such offer of employment with the Park Ridge PD.

33. Approximately at the same time, Plaintiff was being processed for other PD agencies such as Morton Grove, Wheeling, Northbrook and ISP- the Illinois State Police.

34. After previously taking an exam for the position of Police Officer for the Village of Oak Park (sometime in early 2001), Plaintiff was contacted back by that agency some time in late 2002 to be further processed off of his 01 application.

**35.** Upon further processing and consideration, Plaintiff was tendered and accepted an offer of employment with the Village of Oak Park to become a sworn Department member with its Police agency on or about April 3rd 2003, as he was set to begin the Police Academy for that Department on or about April 7th 2003.

**36.** Prior to the discussions of Plaintiff being sworn in as a Department member, Plaintiff was not given the option to waive or extend such offer of employment as it was emphasized by Village representatives that if Plaintiff could not start the training Academy on the date that was originally assigned to him, he would have to decline the offer and he would not be considered for any future officer openings.

**37.** The only reason why Plaintiff considered waiving this offer of employment with the Village of Oak Park in the first place was to finish his last semester needed (after having gone back to college and having spent a considerable amount of time and money in his efforts to become endorsed to teach industrial education and automotive ed.) whereby adding several more endorsements to his already issued State of Illinois teaching certificate / license.

**38.** Plaintiff was also informed to give the go ahead to let his current employer at the time (Union Local 134) notification that he was going to become employed by the Village of Oak Park in the capacity of Police Officer with the swearing in ceremony to take place on or about April 3rd 2003 prior to entering the Police Academy set for April 7th 2003.

**39.** Plaintiff did just that, Plaintiff formally announced his resignation from Local 134 (as per directed to do so by Village representatives), whereby announcing that he was going to be appointed and employed by the Village of Oak Park and the OPPD.

9

40. Prior to becoming officially sworn in as an official member with the OPPD but, after he was notified by Village officials to go ahead and inform his current employer of his resignation, Plaintiff was directed to participate in and take a physical examination in order to be accepted into the Police Academy.

41. During this examination (with the official swearing in ceremony set to take place before the Oak Park Police and Fire Commission commencing within 36 hrs), Plaintiff submitted to and participated in this medical (physical) examination which was required his participation prior to being accepted into this Police Academy.

42. It was during such examination were Plaintiff had disclosed that he had sustained a work related injury and was placed on workman's compensation for several months while working as an apprentice electrician.

43. With the Plaintiff truthfully disclosing such information, healthcare officials did not have the proper staff members that could give the Plaintiff "a clean bill of health" to enter the Police Training Academy for the OPPD on his pre-set date.

44. The decision to appoint Plaintiff for the OPPD was then placed on hold until the Village decided on what to do in this cause as the Village official that kept in contact with Plaintiff had stated that they "never dealt with such a situation like this before."

45. With that being said, Plaintiff's candidacy was placed in limbo until he was sent several months later to see a specialist (Doctor) concerning his injury.

46. Ultimately, this Doctor gave Plaintiff the "clean bill of health" he needed to be accepted into the Police Training Academy for the Village of Oak Park.

**47.**     During this time frame of April to approximately October 2003, Plaintiff was also contacted back by other Police agencies such as Evanston, River Forest and Maywood for potential appointments for those PD agencies as well.

**48.**     An offer of employment that was extended by the Village of Maywood was extended by a Mr. Jeffery Lowenthal, Chairperson from the Police and Fire Commission with that village who was later shot and killed in a Village robbery.

**49.**     Similar offers were also expressed from the City of Evanston as well as the Village of River Forest, however, before those agencies officially made any further commitments concerning Plaintiff's candidacy for those agencies, Plaintiff had expressed that he would choose and accept the Village of Oak Park's initial offer of appointment which (was currently in the works awaiting approval from the Board of Police and Fire Commission for the Village) ultimately, bounced Plaintiff from further consideration for such positions once Plaintiff had stated his intensions.

**50.**     Several Months later while awaiting for further notification from the Board of Police and Fire for the Village of Oak Park on or about November 25th 2003, Plaintiff was alleged to have been involved in a hit-and-run accident involving a Chicago Police Department vehicle operated by and in control of Chicago Police Officers Daniel Vasquez and Susana La Casa Caliz as complained under Federal case #'s 08 C 1789 and 09 C 3286.

**51.**     On November 26th 2003, Plaintiff was arrested without incident at his residence and charged by members of the Chicago Police Department with aggravated fleeing and eluding and leaving the scene of a personal injury accident.

52. During Plaintiff's interrogation, members of the Chicago Police Department wanted to know how many years Plaintiff was "on the Job?" referring that Plaintiff was a one time a Chicago Police Officer.

53. Plaintiff exercised his constitutional rights and remained silent.

54. Approximately several hours later, Plaintiff was then re-interrogated, this time by the Watch Commander who wanted to know what Plaintiff's affiliation was concerning the Oak Park Police Department.

55. Again, Plaintiff exercised his rights to remain silent and requested the presence of his attorney.

56. With that being stated the Watch Commander turned around and then further yelled that "this is just F_cking great" (as he viciously kicked a chair down the hallway of the 14th District Police facility).

57. Plaintiff further states that although he had filed suit in the circuit court against the City of Chicago, Department of Police to be restored to the final eligibility list for appointment to the Chicago Police Department, and was restored to the final eligibility list prior to this accident, Plaintiff was never appointed to the Department.

58. To furthering this, Plaintiff ultimately fought these allegations that had been set forth against him concerning this accident, and on or about January 5th 2006, Plaintiff was found guilty of leaving the scene of a PI accident and was found not guilty of aggravated fleeing and eluding allegation after a jury trial.

59. Plaintiff further states that he is not nor has he ever been referred to as, called by or utilized the name Robert Sroga born on 8-20-1969 with a DL # of S-620-7786-9237

as clearly defined on the official accident crash report in relation to that cause. *See Plaintiff's Exhibit # 1.*

**60.**     Plaintiff's legal and true name is and has always been that of Kevin Robert Sroga Born on November 16th 1974 with a DL # S-620- 5167- 4326.

**61.**     Plaintiff states he did file an appeal in that cause in which his appeal was eventually dismissed for want of prosecution after Plaintiff's attorney took Plaintiff's money that he had put down for his attorney to continue with such proceedings.

**62.**     Plaintiff was ultimately called back by the OPPD to inform him of his new Academy start date, now set for the First week in January 2004, however, as a result of Plaintiff been charged with and having pending criminal allegations, Plaintiff could take part or be sworn in to enter the Police Academy.

**63.**     Plaintiff was contacted and notified of this the very same day he was charged and then released from Chicago Police custody concerning this accident.

**64.**     As a result of this incident, Plaintiff was eventually notified by the OPPD that it would no longer consider him for the position, (a position that he was offered on two separate prior occasions).

**65.**     Also as a result of Plaintiff's alleged involvement in relation to this vehicle accident, Plaintiff has been retaliated against by multiple members of the Chicago Police Department which ultimately led to the filing of two separate cases currently pending before this District.

**66.**     With Plaintiff facing allegations of being the driver involved in this hit-n-run accident involving this Police vehicle and Plaintiff losing his OPPD opportunity, Plaintiff applied and was hired to complete the remainder of the 2005 school year at

Naperville North and Central High Schools, School District 203, finishing out that
year teaching Automotive Education.

67.     For the school year of 2005-2006, Plaintiff applied and was hired by Morton East
High School to teach Carpentry and Construction Technology classes.

68.     Prior to accepting such offer of employment with Morton East High School and
School District 201, Plaintiff applied to and was offered the opportunity to teach
automotive education at Farragut Career Academy for the Board of Education, CPS.

69.     After considering the offer and conducting further outside research upon who the
Plaintiff would have been working for at that time, Plaintiff decided to decline the
offer with Farragut and accept the Morton East Opportunity.

70.     During the school year, word was released during that second half of that year
that long time governing Principal of Farragut Career Academy (Eduardo Guerra)
was stepping down amidst of certain and believable allegations of misconduct.

71.     Plaintiff was under the impression with new blood taking over and in charge of
Farragut Career Academy (after so many years under the previous leadership) things
would look brighter, improve and change for the better.

72.     Plaintiff had underestimated such true intentions of consideration involving such
change in leadership.

73.     Farragut Career Academy, a school on the Semi-south west side of this city
serving the Little Village area always had the reputation of having the # 1 automotive
program within CPS, Plaintiff was hired to keep that reputation alive and well.

**74.** Although Plaintiff applied early in the school year and was essentially offered the open position prior to the 2006 school year ending for the summer, Plaintiff believed he was hired for the position at that point upon the expressed offer from the principal.

**75.** Plaintiff went into CPS sometime during the month of June to be further processed and fingerprinted for this position where no notification was ever established by CPS officials until the second to the last day of summer vacation in August of 06, (when Plaintiff was set to report for his assignment) when he was later informed by CPS officials not to report to the school, and that he had not been approved for hire to work for CPS.

**76.** Plaintiff further states that he has never seen such a disorganized and dysfunctional schooling system then the schooling system of the CPS.

**77.** Prior to accepting this offer of employment for CPS, Plaintiff was contacted by the City of Chicago's Fleet Management Department to fulfill an open position for an electrical mechanical position working for Fleet Management for the City of Chicago.

**78.** Plaintiff never got so far as to accept such offer of employment with fleet as Plaintiff had explained to Fleet (at that time) that he no longer desired such position in light of being offered and hired to fulfill the Farragut position in teaching automotive education.

**79.** Plaintiff was eventually hired some time during the last week of November 2006, Plaintiff's only official notification was to report to the school, in that he had been finally approved for hire by CPS to work for them at Farragut Career Academy in the capacity of automotive instructor.

**80.** Plaintiff states that at that time he was officially hired to fulfill this position, he never received any type of formal or informal training, literature, requirements, ground rules, official documentation to report or any warnings on CPS policies governing the utilizations of either CPS property or policies that would interfere with successful operation of him governing and running this program. (despite what inspector agent Michel's report entailed to the Board in his investigation report).

**81.** Upon Plaintiff being finally approved for hire and taking over and running the automotive program, he was instantly met with resistance from the Building Engineers Department when it was apparent to the Plaintiff that the individuals assigned to this division either did not want to or did not know how to do their jobs.

**82.** Example, Plaintiff had no heat whatsoever in the automotive lab or portion of the affixed classroom from the time he had gotten there (from November) until about the last week of February 2007.

**83.** Plaintiff also encouraged that Department to fix the exhaust system and cover up open and live electrical air conditioner condensers that were still very much "live" with power. **See Plaintiff's Exhibit # 2**

**84.** Without the proper ventilation system or a ventilation system inoperable places the student body and the instructor in such a high risk for a potentially a deadly situation(s) as carbon monoxide does not admit any noticeable odor that would alert an individual of its presence of such poisonous gases that do in fact kill.

**85.** Plaintiff was also meet with resistance from the Athletic Director who was also the Director for the Driver's Education program at Farragut Career Academy, Ms. Ruiz.

**86.** Ms. Ruiz not only thought that she ran automotive program at Farragut High School, but she also thought that she ran High School in of itself.

**87.** This was due to the fact that her good personal friend Theresa Placensia was the new principal of Farragut and that she thought she could get away with taking charge of personnel not directly assigned to her or in her command.

**88.** On multiple occasions Ms. Ruiz demanded that her vehicles (Driver's Education Vehicles) be fixed by the automotive lab.

**89.** At first, Plaintiff was game for the idea who abided by such requests, and was more than willing to help out with such situations.

**90.** As time went on, not only did such requests start becoming highly demanding, cumbersome and a nuisance, they also became impossible to abide by in that such requests started to interfere with the Plaintiff's teaching ability patterns and set schedule of student instruction. **See Plaintiff's Exhibit # 3 Course Syllabus.**

**91.** After Plaintiff conducted further research on whether other automotive instructors were working on school vehicles, Plaintiff was encouraged to immediately stop such practice in light of instructor and legal liabilities.

**92.** Plaintiff did such, including writing a letter to the current Principal that he would not be able to repair or fix any of the school's vehicles any longer in light of the fact of the liability that it would have been placed not only on the instructor, but on his program, CPS and the Board of Education as well. **See Plaintiff's Exhibit # 5.**

**93.** Plaintiff states that after sending that letter, pretty much sealed his fate working at Farragut Career Academy. **See Plaintiff's Exhibit # 6.**

17

**94.** Plaintiff not only taught automotive ed. at Farragut Career Academy, he also volunteered to run and was in charge of an outside summer program in an effort to keep kids off of the streets for the summer time by giving them something constructive to look forward to and do sacrificing Plaintiff's summer vacation.

**95.** The main focus of this program (which was previously approved by downtown administrators working for ETC) was in fact to bring in outside vehicles into the automotive lab for proper inspection, diagnosis and potential repairing all in an effort to not only display real mechanical situations for the students to learn from, but to test and engage them in productive learning environment along with productively engaging them in their mechanical inclination skills as well as to evaluate their abilities to properly perform such inspections, diagnosis and repairs.

**96.** Plaintiff states it was during this time frame plaintiff had brought in some of his own vehicles along with vehicles that had belonged to a friend of his for inspection, diagnosis and student evaluation.

**97.** Plaintiff states that he was in fact renewed for the 2007 and 2008 school year, but was removed from the classroom and his primary teaching assignment(s) on or about October 15th 2008.

**98.** At this time it is unclear as to the real reason or why Plaintiff was officially removed from the classroom (where he was relieved from his normal teaching assignments) as this removal transpired shortly after the Plaintiff had reported an inappropriate encounter between the plaintiff and a female student. **See Plaintiff's Exhibit # 7.**

18

**99.** Plaintiff was ultimately removed from his normal teaching assignments where he was then relocated to an area office to handle administrative duties as per directed by a Mr. Eugene Crawford immediate supervisor of that facility that Plaintiff reported to.

**100.** Plaintiff will state that after being alleged to have been the involved in this Hit-N-Run vehicle accident, he has been arrested over ten (10) plus times all in retaliation for this alleged involvement.

**101.** To further this, on the night of September 21st 2007, Plaintiff was unlawfully stopped by members of the Chicago Police Department while in the Austin Community at approximately 10 P.M. (Augusta and Cicero)

**102.** While approaching Plaintiff, officers inquired if Plaintiff "was on the job," Plaintiff in turn responded that "No he was a school teacher." The officer's then inquired "What the F_uck was he doing in this Neighborhood?"

**103.** Plaintiff in turn responded that "he was on his way home."

**104.** Officers inquired "Where is home?"

**105.** Plaintiff stated that he was a life long resident of the "Humboldt Park" neighborhood (and from the location of Augusta and Cicero), he was approximately less than two miles away from his residence.

**106.** Officers then proceeded to pull the Plaintiff from his vehicle when upon Plaintiff was encountered by a third party officer, SGT. Dany Helwink-Masters.

**107.** As soon as Sgt. Helwink-Masters made eye contact with the Plaintiff, she appeared like she had just won the lottery (as she is very familiar with whom the Plaintiff was).

**108.** Sgt. Helwink-Masters then immediately ordered one of the officers (Papke) to place the Plaintiff into handcuffs.

**109.** Plaintiff was then placed into handcuffs and then arrested as members of the Chicago Police Department began to unlawfully ransack Plaintiff's vehicle.

**110.** Sgt. Helwink-Masters is the wife of LT. Masters in charge of the 25th Police District / AREA 5 Police Headquarters.

**111.** Prior to being appointed to LT. LT. Masters and his wife (Dany) were both SGT's who worked in the 14th Police District, Plaintiff's Police District in where he resides.

**112.** To further this, they both are aware of whom the Plaintiff is and that the Plaintiff was alleged to have been in an accident with a Chicago Police vehicle back in 2003.

**113.** Both Sgt's commanded both Officer La Casa Caliz and Daniel Vasquez from the 14th Police District, the party officers that plaintiff was alleged to have been in a vehicle accident with.

**114.** Officers in turn then arrested Plaintiff under false pretenses and then conducted themselves in what has been known as "creative writing" tactics, whereby falsifying official Police reports and documentation, and then submitting such false reports and information, whereby attesting to these reports as being accurate and truthful in hindsight of what had truly transpired on that night of September 21st 2007.

**115.** During Plaintiff's unlawful detention and arrest transpiring on the evening of September 21st 2007, Sgt. Helwink-Masters from the Chicago Police Department encouraged Chicago Patrol Officers Sherman and Papke to notify the Board of Education to not only inform them of Plaintiff's arrest, but to seek additional and more serious charges against the plaintiff in an effort "to further jam up him up."

**116.** To further this, officers took this a step further and had actually had made contact with one of Plaintiff's immediate supervisors, Defendant Velasquez (one of Plaintiff's primary and immediate supervisor's at that time), officers tried to obtain a signature on a criminal (felony) complaint stating that Plaintiff, was arrested while in the process of burglarizing his place of employment, Farragut after having tripped a burglar alarm.

**117.** Patrol Officer Sherman, {whose father is also a Supervising Police Sgt. for the Chicago Police Department working out of that same Police District, also worked with Sgt. Helwink-Masters and her husband, Lt. Masters, said supervisor who ultimately approved Plaintiff's unlawful arrest and charges).

**118.** On the night of September 21st 2007, Defendant Velasquez and Patrol Officer Sherman had a conversation via telephone concerning Plaintiff's arrest and other legal questions/issues that were exercised in an opportunity to seek such additional more serious charges against the Plaintiff.

**119.** Officer's wanted Ms. Velasquez to sign this said complaint or to put them into contact with someone who would be willing to sign such a complaint against the Plaintiff stating that he was arrested in fact arrested for burglarizing Farragut.

**120.** These officers who worked from the AREA 5 and the 25th District Police station were assigned the AREA 5 Gun Team.

*121.* The AREA 5 gun team has a history of racking up countless Federal complaints and lawsuits including obtaining warrants under bogus and false information all without probable cause (even on fellow Police Officers), and then lying under oath to

cover themselves engaged in such unlawful conduct. **See Plaintiff's Exhibit # 8**

**Markee *Cooper vs. City of Chicago 07 C 2144***

*122.* In essence, what the Plaintiff has uncovered through other research, lawsuits and complaints is the same AREA 5 Gun Team is nothing more than a bunch of rogues hiding behind the very shallow symbol of authority they were entrusted and sworn with to embrace in upholding and protecting the very constitutional rights they have opted to maliciously violate. Units like this one have already been disbanded by the Department amidst Police scandal and officer misconduct.

**123.** For the foregoing reasons, Plaintiff felt (concerning these set of circumstances he found himself in) that it was precisely necessary for Plaintiff's supervisor Ms. Velasquez (at that time, a named Defendant in this suit) to testify to the very conversation and phone call that she had intercepted on that night of September 21st 2007 about these officers conduct, and what these officers were trying to accomplish in consideration of officer Sherman acting under color of state law engaging in an overt act in furtherance of a conspiracy to have the Plaintiff falsely charged in burglarizing his place of employment Farragut Career Academy High school.

**124.** Prior to Plaintiff's supervisor Ms. Velasquez knowing or learning about Plaintiff's arrests, the Plaintiff can only describe that the two had what appeared to be a good respectful, decent, professional working relationship.

**125.** It further appeared to the Plaintiff that once Defendant Velasquez had found out about Plaintiff's arrest record, that she potentially became leery of Plaintiff's character.

**126.** On Monday September 24th 2007, upon plaintiff returning to work, Plaintiff and Defendant Velasquez had a conversation concerning the chain of events which led up to Plaintiff's arrest on Friday September 21st 2007, according to Defendant Velasquez, she had stated to the Plaintiff that patrol officer Sherman represented himself to be a Detective from the Chicago Police Department and had tried to ascertain a signature on a more serious criminal complaint from her, ultimately, trying to state that plaintiff had burglarized Farragut Career Academy High School.

**127.** Plaintiff and defendant discussed this in more detail in which plaintiff had emphasized to Defendant Velasquez to please not forget about the specifics of this conversation and if she needed to, to please write this information down, so she would not forget for future reference.

**128.** Defendant Velasquez assured Plaintiff that she would not forget what was discussed between Chicago Police Officer Sherman and herself.

**129.** Shortly thereafter, Plaintiff was removed from his immediate teaching responsibilities and re-assigned to administrative duties pending the outcome "of an official investigation and the outcome of a hearing" as clearly stated on a previously handed down CPS letter head directed towards Plaintiff, dated on or about October 15th 2007.

**130.** Sometime in November of 2007, Plaintiff was sent another letter "requesting" him to appear at a the IG's headquarters to take part in an "investigatory interview."

**131.** Plaintiff was ultimately **"requested"** to attend this interview sometime in November of 2007 by an investigator Juan Carlos Michel from the Board of Education's Inspector General's Office who is also an agent from that Division.

23

**132.** Based on the language in the letter, it was not even mandatory that Plaintiff show up, attend or participate in such an interview.

**133.** On the date of this interview, Plaintiff did attended however, prior to this interview taking place, Plaintiff had stated that he had a 5th amendment right not to say anything against himself and that he wished not to give any statements concerning the arrests or any pending litigation that Plaintiff had been involved in.

**134.** Plaintiff was then shoved a documentation in his face that had stated something to the effect that refusal or failure to abide by, answer or respond to any of the investigators questioning during this "investigative interview" would be considered conduct of non-cooperative and grounds for immediate termination from CPS.

**135.** After reading this on Investigator's Michel paper work, Plaintiff was encouraged to sign certain documents before him (Michel) prior to this "investigative Interview" commencing alerting Plaintiff if he had fully understood such documentation.

**136.** Plaintiff then agreed to sign these documents only under the terms of **"Duress."**

**137.** Before Plaintiff could sign such paper work, (under these terms) investigator Michel immediately and abruptly grabbed the writing utensil from Plaintiff's immediate possession and control (his hand) whereby, responding to the plaintiff that he was **"not under any duress"** and that there was no **"duress here."**

**138.** Plaintiff entirely disagrees.

**139.** Plaintiff then stated that he wasn't going to answer any of the investigators questions pertaining to any ongoing pending criminal allegations.

**140.** It was put forth to the Plaintiff that if he refused to take part in this interview (that had only requested his presence), that he (Investigator Michel) would in fact and

24

immediately recommend termination to the Board of Education on grounds for failure to co-operate with an official CPS investigation.

141.    With that being held over Plaintiff's head and forced upon him, Plaintiff adhered to his Union Rep's advice, ultimately taking part in this (investigatory) interview.

142.    Prior to giving this (investigatory) interview, Investigator Michel has stated that none of your responses taking part during proceedings can be utilized during any of your criminal proceedings and that this interview was for "Administrative purposes only and any statement given cannot be used against use for your criminally."

143.    Plaintiff entirely disagrees, See *People vs. Dmitriyer* 707 N.E. 2d 121 also, *Lefkowitz v. Turley* 414 U.S. 70, 77, 94 S. Ct. 316, 322, 38 L. E.d. 2d 274, 281 1973).

144.    In fact, on January 4th 2011, Defendant James Sullivan granted WGN Radio and John Williams (host of the John Williams radio talk show), an interview on more or less what the Inspector General's Office is in charge of and what their primary job responsibilities consist of for the Board of Ed.

145.    As clear as day, Chief Inspector Agent Sullivan (who heads that Division) had clearly stated on live national broadcasted radio that the Inspector General's Office is in charge of and responsible for conducting investigations upon Board of education employees and its elected members. He had also stated that if they were alerted or come across information and evidence through or during their course of an investigation(s) that they "would not hesitate to turn over such information to the State's Attorney's Office for proper review or to aid in criminal prosecution(s).

146.    The above is in total contradiction of what Inspector Michel had not only shown Plaintiff on letterhead, but what he had preached and led Plaintiff to believe in

assuring that any information Plaintiff was requested to reveal during the course of this investigative interview concerning the chain of events from his background concerning these pending criminal allegations, could not be used against him.

**147.** Plaintiff further states that this is exactly why a person retains such 5th amendment constitutional right even by, through and during any procedures, formal or informal, including administrative procedures.

**148.** The request by the Plaintiff to exercise such right taking part in during this interview was denied whereby, holding it over Plaintiff's head that if he had "refused to answer any of the Investigators questions, that would in of itself be grounds for immediate termination and dismissal from the Board" and that he (Michel) was going "to immediately recommended termination from the Board for failure to co-operate."

**149.** This is what is commonly referred to as placing a person under "**Duress**."

**150.** Plaintiff ultimately gave such interview faced with the "duress" that the IG's office forced upon him.

**151.** The above procedures that the IG's office practices should be carefully reviewed as in what they are in fact doing is a strict violation of a person's 5th amendment right secured to them under the United States Constitution, regardless if such responses are intended (only) for purposes of administrative purposes whereby, "the administering of such administrative procedures do not preclude the People from the State of Illinois from subpoenaing IG reports, Agents, depositions, or any other official testimony for use in a further and pending criminal or civil action against a party."

**152.** To further this, Plaintiff was reassigned to this District Office for more than a year and half and was only then terminated from his employer when he had tried to

26

exercise his 6th amendment right under the United States Constitution as reinforced under Article I, and Section 2 of the Bill of Rights to the Illinois Constitution under Due process for obtaining witnesses and documentation to be produced in his favor.

153. On several occasions, Plaintiff has held several discussions with Defendant *Ciesil or "AKA" The Hatchet-Man* (a nickname given to Defendant **Ciesil** by Chicago Teachers Union Representatives as Defendant **Ciesil** prides himself in aggressively seeking termination proceedings against CPS employees), via telephone concerning such rights, which almost always led to Defendant **Ciesil** or "*AKA*" **Hatchet-Man** aggressively slamming the phone down and hanging up on the Plaintiff in a very childish, rude and immature way. **See Plaintiff's Exhibit # 9**

154. Plaintiff even submitted official documents and case law authorizing and setting forth his constitutional securities assuring the Board of what he was engaging in was perfectly legal, proper and justified under the laws. **SEE Plaintiff's Exhibit # 10.**

155. In fact, Defendants **Ciesil** and **Seaberry** went to such an extreme extent of obtaining an unlawful court order from preventing Plaintiff from exercising such rights and immunities secured to him under the U.S.C. ultimately threatening Plaintiff with arrest if he had tried to exercise such a constitutional rights upon CPS property.

156. When the court entered its (unlawful) order, it had specified that Plaintiff could not go on CPS property for the "sole" purpose of subpoenaing his witness, but could go to and on CPS property if he had to attend other types of business.

157. The above order was entered in clear violation of Plaintiff's constitutional securities and immunities secured to him under the Sixth and Fourteenth amendments to the United States Constitution as reinforced under the Illinois Constitution under

27

Article I Section 2 under the Bill of Rights, Due Process and Equal Protection
clauses.

**158.** Although the order was in contravention to state and federal law, Plaintiff could
have could have legally disregarded it, in any event, Plaintiff decided to abide by the
order out of proper respect to both the court and the Board.

**159.** Once this unlawful order was entered, Plaintiff was informed that any time he had
to enter CPS property at the location of 125 S. Clark St. - CPS Headquarters, he
"must" stop in at safety and security to not only get permission to be on the premises,
but, to be escorted through out the building (like a child) wherever he needed to go.

**160.** In fact, on one occasion while Plaintiff was being escorted through the building
on CPS related business, another ignorant uneducated off-duty Chicago Police
Officer retained by the Board of Ed. to work as a security officer mocked, threaten,
made fun of Plaintiff by making further derogatory statements against him.

**161.** That same John Doe Officer then invaded Plaintiff's personal privacy by
extracting a personal letter that was submitted to another one of Plaintiff's
supervisor's working out of ETC after being successfully delivered, submitted and
handed into that person's personal and private mailbox.

**162.** Such conduct by the Board of Education's personnel should be carefully reviewed
and scrutinized as a personal invasion of Plaintiff's personal privacy rights ensued.

**163.** Upon these Board employees setting forth these unlawful obstacles that had
placed such an extreme burden upon the Plaintiff from exercising his compulsory
rights secured to him under the U.S.C. as reinforced by the Illinois Constitution
whereby maliciously interfering with Plaintiff's lawful conduct in trying subpoena

and secure his former boss (Defendant Velazquez) to testify for his pending court proceeding, Plaintiff then moved to subpoena the official background investigation report concerning certain statements made to the IG's office by Defendant Velasquez to see if the pursuit of ascertaining her as a defense witness was further relevant, warranted, and further needed.

**164.** On or about what Plaintiff recalls the date of January 2009, Plaintiff issued and then served a subpoena upon Chief Inspector General Agent himself James Sullivan.

**165.** On this date and time, it was specifically stated that Plaintiff was seeking any and all statements made to his office concerning the interview with Defendant Velasquez.

**166.** At first, Defendant Sullivan accepted the subpoena and stated that he would abide by the subpoena and turn over such documentation and abide by the subpoena.

**167.** Plaintiff heard nothing else after that until approximately several weeks later when he had followed up with a phone call to the Inspector General's Office.

**168.** Several days after that phone call of (Plaintiff) inquiring as to the information that he was seeking, Plaintiff was issued a letter by the IG's Office stating "that he was sorry if he had misspoke and that they (the Inspector General's Office) would not honor his subpoena or request" pertaining to such information and request. **See**

**Plaintiff's Exhibit # 11.**

**169.** Plaintiff then properly served and delivered another subpoena (on a second occasion several weeks later) requesting the same information and documentation and insisted on such information to be provided (shortly after his first subpoena request was denied).

29

**170.** Upon Plaintiff serving his second subpoena, directed towards, personally handed to and serving upon Chief Inspector General Agent Sullivan himself (requesting the same documentation and information), Plaintiff states that he was forced into a position of having to have to force his hand in regards to having his subpoena honored, whereby stating to Defendant Sullivan that "he is in desperate need of such information for the utilization for his pending criminal allegations concerning what had transpired between the interview that Defendant Velasquez gave to this Office pertaining to the conversation with her and officer Sherman to be potentially utilized as evidence and that needed such to prepare for his defense, and that if this Office was unwilling to abide by his subpoena that he (Plaintiff) was going to seek an order to hold someone out of his office in direct contempt of court in violation of his properly served subpoena and the information that he was requesting.

**171.** Approximately two weeks after that (maybe a little more) Plaintiff was given the entire investigation concerning the Inspector General's background report upon him.

**172.** Approximately a week or so after that, Plaintiff was notified by a Ms. Cheryl Colsten that an "Investigatory Conference" had been scheduled concerning Plaintiff's case which explained to the Plaintiff that if he could not attend this conference to notify and inform them of such.

**173.** Plaintiff states he did just that, on the day this Investigatory Conference was set, plaintiff could not make the date and time scheduled and did so notify his Union Rep. (Theodore Hijiharis) as well as Ms. Colsten herself pertaining to this. **See Plaintiff's Exhibit # 12.**

30

**174.** On the date and time this Investigatory Conference was to commence (on or about March 5th 2009), Plaintiff's request for another and new date was denied where such Investigatory Conference commenced and ensued without Plaintiff's permission and participation (as a previously request to participate was properly filed) whereby requesting Ms. Colsten to please assign a new date concerning this "Investigatory Conference." **See plaintiff's Exhibit # 12**

**175.** Plaintiff states that his properly submitted request to assign a new or another date (for this Investigatory Conference) was not given proper (or any) consideration.

**176.** A short time later after this "Investigatory Conference" had ensued (over Plaintiff's objection), Plaintiff received a letter by a Mr. Ronald Huberman - CEO from CPS notifying him that he was immediately suspended without pay pending recommendation from his position as CEO to his terminate the his services from the Board of Ed. Plaintiff further states is whole procedure is "nothing more than a sweeping under the rug procedure (so to speak) by the Board," once a person is recommended for such termination, a party in Plaintiff's position has no recourse to either go before the Board in an effort to defend, explain or pled its case such as Plaintiff had tried to do. **See Plaintiff's Exhibit # 13**

**177.** What the Board of Education had actually engaged in considering these set of circumstances involving this situation is what's known as *"Retaliatory Conduct."*

**178.** Plaintiff further states, Defendant Velasquez was finally secured as a Defense witness concerning Plaintiff's case (after Plaintiff was terminated from CPS), ultimately being secured by the People of the State of Illinois (State's Attorney's), whereby only after being ordered to do so by the presiding judge in Plaintiff's case.

31

**179.** It was and is apparent and evident that Defendant Velasquez who was subpoenaed on countless occasions via certified mail and who was personally served by a Cook County Sheriff's Deputy (Davis, who had served her at her place of employment) purposely failed to abide by the properly issued and served subpoena's, ultimately interfering with Plaintiff's Due Process rights. **See Plaintiff's Exhibit # 14.**

**180.** To further this, Defendant Velasquez had stated to one of the Board attorney's on the Plaintiff's trial date that she "did not come here or showed up on behalf of the Plaintiff and that she was only there for purposes or for the State (only)" and that she was "not going to return the next day" (if she had to).

**181.** During Plaintiff's trial, Defendant Velasquez was in fact called into court to testify as a defense witness to the conversation that had ensued between her and Officer Sherman on the night of Plaintiff's arrest transpiring on September 21st 2007.

**182.** Defendant Velasquez claimed and testified before the court that she "could not remember what was asked by the officer or what statements she had given to the officer," ultimately, clearly evident that she was not only refusing to cooperate, but unwilling to accurately testify the truth pertaining to the chain of events which had unfolded concerning that night whereby further depriving plaintiff of Due Process.

**183.** Plaintiff states that Defendant Velasquez is a highly educated person holding at least a Master's degree plus (+) in the foundation of educational course work and study in addition to, holding an Administrative Certificate through the State of Illinois actively working as an Assistant Principal, who was then later promoted to a higher level of responsibility with the Board of Education (CPS) whereby being transferred to downtown headquarters located at 125 S. Clark St.

**184.** With all of this coupled together, in that the numerous subpoenas sent via certified mail by the Plaintiff requesting her appearance, [ *Plaintiff's Exhibit # 14* ] the phone messages left by the Plaintiff that went unreturned concerning such subpoenas, being personally served by the Cook County Deputy Sheriff's Office and Officer Davis, never appearing on or responding to any of these court requests to appear after being properly served to do so directing her of such appearances, and then making such a bold statement that she did not appear on behalf of the Plaintiff's subpoena(s) and that she was "only there on behalf of the State" (as a State witness) would only lead a reasonable and prudent person to believe that Defendant Velasquez not only denied Plaintiff of his right to a fair trial proceedings, but also, interfered with Plaintiff's immunities and securities secured to him under the U.S.C. as reinforced by the Illinois Constitution under the Bill of Rights, in addition to violating the personal trust ensued and entrusted up in her upon holding such a vital position as a State Certified Administrator for the State of Illinois and its educational system as well as neglecting to do the right thing as a citizen of the United States.

**185.** On information and believe, Plaintiff believes that either Board attorneys and or other employees related to or working for the Board of Education, persuaded, talked to, informed and or encouraged Defendant Velasquez not to co-operate with Plaintiff's requests which ultimately violated Plaintiff's constitutional securities and immunities secured to him under the both constitutions of the United States and under Illinois law and the Bill of Rights.

**186.** Plaintiff further states that not only is he filing this complaint against the Board of Education and named Defendants based upon a *Federal Question to redress Civil*

33

*Right(s) violations* and to curb such further conduct on behalf of these "Defendants" he's also filing this suit in an effort to help inform and educate the very simple headed people involved in this suit in an effort to help educate them about today's society on what the real Chicago Police Department is truly all about.

187.  Plaintiff continues to state that this is how things are done in Chicago concerning the Chicago Police Department and its members as he has first hand experience on how such things are done being born and raised in the Humboldt Park Community.

188.  Plaintiff further states, while growing up in his community he was always subjected to unlawful street stops by such Department members as his nationality is that of White Caucasian living in a predominately Hispanic neighborhood.

189.  The basis for such street stops was for that of WWOTPW which stands for being "WHITE WHILE ON THE PUBLIC WAY," referencing that a White Caucasian (like the Plaintiff) was only in this type of neighborhood for the purchase(s) narcotics.

190.  In fact, referencing to an incident transpiring back on or about the year of 1994, Plaintiff and his younger brother were stopped (outside of their residence) by what was known on the streets at that time as "Three Deep," a phrase that was heavily utilized in Plaintiff's neighborhood at that time to signify an unmarked police vehicle (usually containing 3 individuals) belonging to the (once existent) Gang Crimes Unit of the Chicago Police Department (a unit that was ultimately disbanded amidst Police misconduct, scandals and corruption).

191.  While inquiring why it was Plaintiff was being pulled over and stopped that night, a large white male civilian dressed Chicago Police Officer immediately grabbed and pulled Plaintiff (very aggressively) from his vehicle whereby, choking and slapping

Plaintiff about the face on several occasions, the officer then proceeded to picked up the Plaintiff only to slam him on top of the front of the Unmarked Police Vehicle all for no apparent or justifiable reasoning.

**192.** Plaintiff further states that this was just how things were done growing up in his neighborhood, a practice which is still in existence and exercised today by certain and some members of the CPD.

**193.** Plaintiff further states that he never forgot the specifics of what had transpired that night as it has been permanently molded into Plaintiff's head.

**194.** In fact, several years later, while Plaintiff was watching the news, it was revealed to the Plaintiff who that officer was that night that had brutally battered him, the officer that battered and assaulted him was none other then the infamous *Joseph Miedzianowski*, the Chicago Police Officer currently serving a life prison term for being the most corrupt Chicago Police Officer to have ever roamed the streets of Chicago working as a Police Officer.

**195.** Plaintiff further states, (in his personal view) the reasons why this is allowed to and transpires is that the City of Chicago, Department of Police, generally appoints individuals to the Department that are so often not even qualified to walk person's dog around the block, let alone referencing such people as "*Chicago's Finest*" and embracing these people with badges, guns and very little knowledge on the law.

**196.** As stated another way, a huge mistake that the city generally intends to engage in upon their hiring practices upon deciding to appoint individual(s) to the Department is that the City generally hires and appoints persons looking for a job instead of appointing individuals looking to perform or work in a profession.

**197.** In fact, Police misconduct was so such a common problem with the Chicago Police Department that Mayor Richard M. Daley and the City of Council appointed former outside FBI agent Jody Weis in an extreme effort(s) to try to get a grip on the scandalous Department and Officer Misconduct that has plagued this City.

**198.** To further this, the marching orders of the now a disbanded Special Operations Section **"AKA"** SOS (which had an inside term referenced to the "Sons of Supervisors" Unit in light of the fact just about every member assigned to that unit had what was commonly referred to a "Phone Call" or "Clout" to get into the Unit) encouraged the violation of constitutional laws and falsification of police reports.

{On U-TUBE} **See 60 Minute episode dated June 1ˢᵗ 2008, with Katie Couric and Chicago Police Officer Keith Herrera which stated as follows**:

**199.** {*Katie Couric @ 1:30* } "Making illegal arrests, busting into peoples homes and falsely arresting people."

**200.** {*Katie Couric @ 1:48*} "What would your marching orders be?"

**201.** {*Officer Keith Herrera @ 1:52* } "Get the guns and the drugs off the street, at any cost... no matter what."

**202.** {*Officer Keith Herrera @ 2:20* }Supervisors encouraged such illegal activities.

**203.** {*Katie Couric @ 3:05} "I* get it, but it's also making stuff up. "

**204.** {*Katie Couric @ 3:12} "Changing the story. "*

**205.** {*Officer Keith Herrera @ 3:17*}"it happens."

**206.** {*Katie Couric @ 3:20} "So* there are no boy scout Police Officers doing it by the book out there?

36

**207.** {*Officer Keith Herrera @ 3:22* } "Maybe, this isn't Pod -Neck Iowa out there, this is the City of Chicago, you got to do a job."

**208.** {*Katie Couric*} "It was a well known practice in SOS to write things in police reports that didn't actually happen."

**209.** {*Katie Couric @ 4:35*} "Was it well known practice in SOS to write things in police reports that didn't actually happen on the scene?

**210.** { *Officer Keith Herrera @ 4 :45*} "Creating writing was a certain term that bosses used to make sure that the job got done. I didn't just pick up a pen and just learn how to do this. Bosses, guys that I worked with that were older than I was, that had time on the job, you learn this stuff. It's taught to you. This is how it's done. This isn't right. Put this in there. And you got to listen to (th)em."

**211.** {*Katie Couric*} "The SOS Unit and its officers believed they were above the law; SOS Supervisors encouraged the unit to commit misconduct and criminal activity."

**212.** {*Katie Couric @ 6:02*} Considering the low rate of disciplinary action against the SOS officers, are you concerned that an atmosphere existed where members of the Department thought that they could commit misconduct with impunity? {*CPD Superintendent Weis @ 6:18*} I think there probably was an atmosphere that hey, we're above the law. We're getting great stats. We're pulling guns off the street. We're taking down drug dealers. Yeah, maybe we are breaking the rules maybe we are breaking the laws, but look what we've accomplished. They lost their way, and it saddens me because supervisors have a lot of power and if they're encouraging their people to engage in misconduct or actually in some instances even engage in criminal activity, that is horrific in my eyes."

**213.** The above is just one example on how things have always been conducted on the streets involving members of the Chicago Police Department.

**214.** Finally, Plaintiff states that although some of the above paragraphs "may" be somewhat a little irrelevant and cumbersome in relation to his complaint, non-the-less plaintiff felt and deemed it necessary to state all of the above in an effort to fully explain and incorporate all of the set of circumstances pertaining to this suit.

## COUNT I
## 42 U.S.C. SECTIONS 1983 –
## VIOLATION OF DUE PROCESS UNDER U.S.C.
Plaintiff against VELASQUEZ, CIESIL, SEABERRY and JOHN and JANE DOE
DEFENDANTS

**215.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**216.** Defendants VELASQUEZ,CIESIL, SEABERRY, JOHN and JANE DOE DEFENDANTS had a lawful duty to not-engage in conduct that shall interfere with Plaintiff's Due Process rights afforded to him under the Sixth Amendment under the United States Constitution as so relating to Due Process.

**217.** Such conduct on behalf of these Defendants did in fact interfere with Plaintiff's Due Process rights afforded to him under the sixth (6th) Amendment of the U.S.C.

**218.** As a direct result of this outrageous conduct and the actions undertaken by these Defendants "***shocks the conscience,***" and in doing so deprived Plaintiff of certain immunities and securities granted to him under the United States Constitution and the laws enacted thereunder.

38

**219.** At all relevant times, said Defendants were acting under color of state law whose actions were willful, wanton, intentional and malicious. Punitive damages as well as other and actual damages should be awarded in order to punish and deter such future conduct.

**220.** Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and other damages in an amount deemed at time of trial to be just fair, and appropriate.

## COUNT II
## 42 U.S.C. SECTIONS 1983 –
## VIOLATION OF DUE PROCESS - *STATE CLAIM*
Plaintiff against VELASQUEZ, CIESIL, SEABERRY and JOHN AND JANE DOE DEFENDANTS

**221.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**222.** Defendants VELASQUEZ,CIESIL, SEABERRY, JOHN and JANE DOE DEFENDANTS had a lawful duty to not-engage in conduct that shall interfere with Plaintiff's Due Process rights afforded to the Plaintiff in reference to the Illinois Constitution under Article I, Section 2 of the Bill of Rights.

**223.** Such conduct on behalf of these Defendants did in fact interfere with Plaintiff's Due Process rights afforded to him under Article I, Section 2 of the Illinois Constitution under the Bill of Rights.

**224.** As a direct result of this outrageous conduct and the actions undertaken by these Defendants "*shocks the conscience,*" and in doing so deprived Plaintiff of immunities

39

and securities secured to him under the Illinois State Constitution and the laws enacted thereunder.

225.    At all relevant times, these Defendants' were acting under color of state law whose actions were willful, wanton, intentional and malicious towards Plaintiff's civil rights. Punitive damages as well as other and actual damages should be awarded in order to punish and deter such future conduct.

226.    Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and other damages in an amount deemed at time of trial to be just, fair and appropriate.

# COUNT III
## CONSPIRACY TO COMMIT THE SAME
## 42 U.S.C. SECTIONS 1983, 1985 AND 1986 –
## Conspiracy to interfere *w/ Due Process Rights*
Plaintiff against VELASQUEZ, CIESIL, SEABERRY and JOHN AND JANE DOE DEFENDANTS

227.    Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully though set forth herein.

228.    Defendant VELASQUEZ, CIESIL, SEABERRY, JOHN and JANE DOE DEFENDANTS had a lawful duty to not-engage in conduct that shall interfere with Plaintiff's Due Process rights afforded to the him under *BOTH* the United States and the Illinois Constitutions.

229.    Plaintiff states that Defendants did in fact enter into an agreement and conspired against the Plaintiff ultimately, reaching to an oral agreement in furtherance of said

conspiracy, whereby depriving the Plaintiff of certain Constitutional rights secured to him under both the United States Constitution and the Illinois Constitution.

**230.** In furtherance of this conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in such joint activity.

**231.** Such conduct on behalf of these Defendants did in fact interfere with Plaintiff's Due Process rights afforded to him under BOTH the United States and the Illinois Constitutions as so relating to Due Process.

**232.** This also includes the duty of the Defendants to not to engage or take part in such a conspiracy, whereby any and all failures to report such conduct in furtherance of this said conspiracy to a higher level of authority shall be deemed liable under such.

**233.** As a direct result of this outrageous conduct and the actions undertaken by these Defendants *"shocks the conscience,"* and in doing so deprived Plaintiff of immunities and securities afforded to him under the United States and the Illinois Constitutions.

**234.** At all relevant times, these Defendants' were acting under color of state law whose actions were willful, wanton, intentional and malicious. Punitive damages as well as other and actual damages should be awarded in order to punish and deter such future conduct.

**235.** Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and other damages in an amount deemed at time of trial to be just, fair and appropriate.

**COUNT IV**
**42 U.S.C. SECTIONS 1983-**

## SUPERVISORY LIABILITY
### Plaintiff against HUBERMAN, BEBLY, CIESIL, DURBAK, O'CONNELL, SULLIVAN, COLSTEN and JOHN and JANE DOE DEFENDANTS

**236.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if fully though set forth herein.

**237.** Defendants HUBERMAN, BEBLY, CIESIL, DURBAK, O'CONNEL

SULLIVAN, COLSTEN and JOHN and JANE DOES either were or are in some type of capacity supervisors with different Departments employed by the Chicago Board of Education who had a lawful duty to not-engage in conduct that shall interfere with Plaintiff's Due Process rights (or any other rights secured) to the Plaintiff under *BOTH* the United States and the Illinois Constitutions as so relating to Due Process.

**238.** Such a duty to not engage in a conspiracy also includes the duty to prevent any attempts thereof and or any failures to report the same to a higher level of authority.

**239.** Plaintiff further states that each Defendant did in fact enter into a conspiracy whereby exercising a meeting of the minds ultimately, reaching into an oral agreement in furtherance of this said conspiracy, whereby depriving the Plaintiff of civil rights secured to him under both the United States and the Illinois Constitutions.

**240.** Such conduct on behalf of these named defendant Supervisors did in fact interfere with Plaintiff's Due Process rights afforded to him under BOTH the United States and the Illinois Constitutions.

**241.** As a direct result of this outrageous conduct and the actions undertaken by these Defendants, *"shocks the conscience,"* and deprived Plaintiff of immunities and

securities afforded to him under the United States and the Illinois State Constitutions and the laws enacted thereunder.

**242.** At all relevant times, said Defendants' were acting under color of state law whose actions were willful, wanton, intentional and malicious. Punitive damages as well as other and actual damages should be awarded in order to punish and deter such future conduct.

**243.** Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and other damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT V

## 42 U.S.C. SECTIONS 1983, 1985 and 1986 - 14th AMENDMENT
## EQUAL PROTECTION CLIAM AND CONSPIRACY TO DEPRIVE
Plaintiff against HUBERMAN, BEBLY, CIESIL, SEABERRY, DURBAK, O'CONNELL, SULLIVAN, MICHELE, COLSTEN, VELASQUEZ and JOHN and JANE DOE DEFENDANTS

**244.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if fully though set forth herein.

**245.** Defendants HUBERMAN, BEBLY, CIESIL, DURBAK, O'CONNEL SULLIVAN, MICHELE, COLSTEN, VELASQUEZ and JOHN and JANE DOE DEFENDANTS entered into a common scheme to work a denial of Plaintiff's Equal Protection rights afforded to him under the 14th Amendment of the United States Constitution and the laws enacted thereunder.

43

**246.** This duty to not engage in such conduct also includes the duty to prevent the same of any conspiracy, attempted conspiracy or any failures to report the same to a higher level of authority.

**247.** Plaintiff further states that each Defendant did in fact enter into a conspiracy, ultimately reaching an agreement in furtherance of this said conspiracy, whereby depriving plaintiff of certain constitutional rights secured to him under the 14th Amendment to the United States Constitution and the laws enacted thereunder.

**248.** In furtherance of this conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in such joint activity.

**249.** Such conduct on behalf of these named defendant Supervisors did in fact interfere with plaintiff's Due Process rights afforded to him under BOTH the United States and the Illinois Constitutions.

**250.** As a direct result of these Defendants outrageous conduct, especially, embracing such titles and responsibility in such a supervisory position with the responsibility to the Board of Education to act the same, the Defendants conduct not only *"shocks the conscience,"* but, deprived Plaintiff of immunities and securities secured to him under the United States and the Illinois State Constitutions and the laws enacted thereunder.

**251.** At all relevant times, these Defendants were acting under color of state law whose actions were willful, wanton, intentional and malicious. Punitive damages as well as other and actual damages should be awarded in order to punish and deter such future conduct.

**252.** Wherefore, Plaintiff demands judgment against these Defendants and each of them for actual, compensatory and other damages in an amount deemed at time of trial to be just fair and appropriate.

**COUNT VI**

**- EQUAL PROTECTION CLAUSE VIOLATION CLIAM
UNDER THE ILLINOIS CONSTITUTION, ARTICLE I, BILL OF RIGHTS**
Plaintiff against HUBERMAN, BEBLY, CIESIL, SEABERRY, DURBAK,
O'CONNELL, SULLIVAN, MICHELE, COLSTEN, VELASQUEZ and JOHN and
JANE DOE DEFENDANTS

**253.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**254.** Defendants HUBERMAN, BEBLY, CIESIL, DURBAK, O'CONNEL

SULLIVAN, MICHELE, COLSTEN, VELASQUEZ and JOHN and JANE DOE

DEFENDANTS entered into a common scheme to work a denial of Plaintiff's Equal

Protection rights secured to him by the Illinois Constitution under Article I -The

BILL OF RIGHTS under section 2 of the Illinois Constitution and the laws enacted

thereunder.

**255.** At all relevant times, said Defendants were acting under color of state law whose actions were willful, wanton, intentional and malicious.

**256.** These Defendants had a civil and a lawful obligation including a duty to not-engage in conduct that shall interfere with plaintiff's EQUAL PROTECTION RIGHTS secured to the Plaintiff under the Illinois Constitution and the laws enacted thereunder.

45

**257.** This duty to not engage in such conduct also includes the duty to prevent the same of any conspiracy, attempted conspiracy or any failures to report the same to a higher level of authority.

**258.** Plaintiff further states that each Defendant did in fact take on such conspiracy, ultimately, engaging in a meeting of the minds whereby reaching an oral agreement in furtherance of a conspiracy, where each co-conspirator committed overt acts and was an otherwise willful participant in such joint activity, ultimately, depriving the Plaintiff of certain Constitutional rights secured to him under his Equal Protection rights secured to him under Article I – Section 2 of The BILL OF RIGHTS and by and through the Illinois Constitution and the laws enacted thereunder.

**259.** Such conduct on behalf of these named Defendants did in fact interfere with Plaintiff's EQUAL PROTECTION afforded to him under the Illinois Constitution.

**260.** As a direct result of this outrageous conduct and the actions undertaken by these Defendants, *"shocks the conscience,"* and deprived Plaintiff of immunities and securities afforded to him under the Illinois Constitution.

**261.** Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.


## COUNT VII

### 42 U.S.C. SECTIONS 1983 –
### RETALITORY DISCHARGE/CONDUCT

Plaintiff against HUBERMAN, BEBLY, CIESIL, SEABERRY, SULLIVAN, MICHELE, COLSTEN and JOHN and JANE DOE DEFENDANTS

**262.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**263.** On or about March 25th 2009, Plaintiff was officially discharged from CPS and from his services as a school teacher / instructor / educator.

**264.** Defendants HUBERMAN, BEBLY, CIESIL, SULLIVAN, MICHELE, COLSTEN, and JOHN and JANE DOE DEFENDANTS entered into a common scheme to *RETALIATE* against the plaintiff by *Discharging him from his CPS* duties, responsibilities and services as a school teacher, (only) after Plaintiff was engaging in both a Federally and State protected constitutional practice commonly known to be that of "Public Policy" whereby, retaliating against the Plaintiff for engaging in such protective right in which Defendants then commenced unwarranted termination proceedings against the Plaintiff (all in retaliation against the Plaintiff) for exercising such securities and immunities secured to him under both the United States and the Illinois Constitutions.

**265.** At all relevant times, said Defendants were acting in concert under color of state law whose actions were willful, wanton, intentional and malicious.

**266.** These Defendants had a civil and a lawful duty to not-engage such conduct that would retaliate against the Plaintiff for exercising such constitutional rights.

**267.** This duty to not engage in such conduct also includes the duty to prevent the same of any conspiracy, attempted conspiracy or any failures to report the same to a higher level of authority.

**268.** Plaintiff further states that each Defendant did in fact enter into and engaged in such conduct, ultimately reaching into an agreement in furtherance of this said

47

agreement whereby setting forth such termination proceedings all in retaliation for plaintiff exercising his both Federally and State protected constitutional rights.

**269.**     Such conduct on behalf of these named Defendants was in fact Retaliatory Conduct as so relating to retaliatory discharge in nature towards the Plaintiff.

**270.**     As a direct result of these named Defendants outrageous conduct, whereby acting in concert with one another to achieve a concerted action to accomplish an unlawful purpose by an unlawful means, the conduct engaged by and complained about by these named Defendants not only "*shocks the conscience*," but, was undertaken in stride of Plaintiff exercising immunities and securities afforded to him under the United States and the State of Illinois Constitutions.

**271.**     Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and extreme punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

**COUNT VIII**

**42 U.S.C. SECTIONS 1983 –**
**FAILURE TO INTERVENE**

Plaintiff against HUBERMAN, BEBLY, CIESIL, SEABERRY, SULLIVAN, MICHELE, COLSTEN and JOHN and JANE DOE DEFENDANTS

**272.**     Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**273.**     Defendants HUBERMAN, BEBLY, CIESIL, SEABERRY, SULLIVAN, MICHELE, COLSTEN, and JOHN and JANE DOES DEFENDANTS all had a duty

to "Intervene" in regards to safeguarding Plaintiff's constitutionally protect civil securities granted to him under both the United States and Illinois Constitutions.

**274.** All Defendants acting under color of state law during the course of their employment while employed by the Chicago Public Schools system had a **"duty to intervene"** to either stop and or prevent such deeds of misconduct generated by their fellow colleagues and supervisors.

**275.** In addition to, these Defendants ultimately failed to secure, preserve or disallowed to be executed Plaintiff's constitutionally protects rights, whereby, ultimately "Failing to Intervene" in the Plaintiff's constitutional protection of his civil rights.

**276.** Defendants failed to exercise diligently in one way or another and had violated their own "duty to intervene" as sworn members of a City/ Municipal agency during the course of their employed activities in the prevention of having Plaintiff's constitutionally protected rights from being intentionally, willfully, maliciously, wantonly and unjustifiably violated in a reckless manner by fellow colleagues and other subordinates.

**277.** By reason of these Defendants conduct for failing to Intervene, Plaintiff was deprived of rights , privileges and immunities secured to his by the sixth and Fourteenth Amendments to the Constitution of the United States and under the Article I of Section 2 of the Bill of Rights in relation to the Illinois State Constitution. Therefore, Defendants are liable to Plaintiff under the *"Failure to Intervene"* doctrine pursuant to 42 U.S.C. Section 1983.

**278.** Wherefore, Plaintiff demands judgments against these Defendants and each of them for actual, compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT IX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Plaintiff against ALL DEFENDANTS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**279.** Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**280.** The acts and conduct of these Defendants as set forth were so extreme and outrageous that Defendants intended to cause, or were in a reckless disregard of the probability that their conduct would cause, severe emotional distress to the Plaintiff.

**281.** Said actions of misconduct did directly and proximately cause severe emotional distress to the Plaintiff thereby constituting intentional infliction of emotional distress.

**282.** Defendants conduct was undertaken with such malice, willfulness, and a reckless indifference to Plaintiff's rights.

**283.** As a proximate result of the Defendants wrongful acts and outrageous egregious conduct, Plaintiff suffered and continues to suffer damages, including extreme and severe emotional distress and anguish.

**284.**   Wherefore, Plaintiff demands judgment against all Defendants and for actual,

compensatory and punitive damages in an amount deemed at time of trial to be just,

fair and appropriate.

**COUNT X**

**42 U.S.C. SECTIONS 1983 –**

**MUNICIPAL LIABILITY DOCTRINE**

**285.**   Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-

hundred and fourteen (214) as if though fully set forth herein.

**286.**   The Defendant Board of Education-Chicago Public Schools -CPS is a

Municipal corporation created under and subject under Illinois State Law and has its

principle place of business in Chicago, Illinois.

**287.**   The Defendant Chicago Board of Education failed to take the necessary

precautions to adequately "Train and or Supervise" its employee agents.

**288.**   The Defendant Chicago Board of Education-CPS and its agents had worked a

"deliberate indifference" to Plaintiff's civil rights on multiple occasions.

**289.**   These deliberate indifferences can only be attributed to the Board of Educations

and CPS's failure to train and supervise its agents. Therefore, Defendant CPS-

Chicago Public Schools and the Board of Education is liable under the Municipal

Liable doctrine pursuant to 42 U.S.C. Section1983.

**COUNT XI**

**RESPONDEAT SUPERIOR**

**290.**     Plaintiff hereby incorporates and re-alleges paragraphs one (1) through two-hundred and fourteen (214) as if though fully set forth herein.

**291.**     All Defendants- either were or are members and or agents of the Chicago Public Schooling system "AKA" **CPS** and the Board of Education for the City of Chicago.

**292.**     In committing these intentionally willful, malicious, wanton, egregious acts of misconduct against the Plaintiff, Defendants committed them while acting under color of state law during the scope of their employment.

**293.**     Defendant, Chicago Public Schools –CPS and the Board of Education is the primary employer Municipality of all Defendants.

**294.**     Pursuant to *respondeat superior*, Defendant CPS-Chicago Public Schools and the Board of Education as principal, is liable for its agents' actions.

**295.**     As a proximate cause of Defendants unlawful acts which occurred within their scope of employed activities, Plaintiff suffered severe and extreme damages including but not limited to, financial, severe psychological, mental and emotional distress, mental distress and anguish, anxiety, fear, humiliations, traumas, destruction of reputation as well as loss of wages.

## COUNT XII

## INDEMNIFICATION CLAIM UNDER ILLINOIS LAW SECTION 745 ILCS 10/9-102

**296.**     Illinois law provides that public entities WILL BE directed to pay any tort judgment compensatory damages for which employees are liable within the scope of their employment activities.

**297.** The acts of these individual Defendants as described in the above claims were undertaken by these Defendants while acting under color of state law during their employed activities and were willful, wanton and malicious committed during the scope of the Defendants employment.

**298.** Pursuant to the Illinois Tort Immunity Act, **745 ILCS 10/9-102**, Defendant Chicago Public Schools-CPS and the Board of Education will be liable for any and all judgments in this cause arising from the actions of the Defendant employees and or its Officer agents and representatives.

**WHEREFORE**, the Plaintiff, Kevin Sroga, respectfully requests judgment as follows against School **DISTRICT 299** and its agent Defendants and each of them on all claims and to:

1. Require the Defendants to pay the Plaintiff, actual and compensatory damages, including emotional distress, in a sum to be determined at trial;

2. Require the Defendants to pay the Plaintiff special damages in a sum to be determined at trial;

3. Require the Defendants to pay the Plaintiff punitive / exemplary damages in a sum to be determined at trial;

4. Require the Defendants to pay the Plaintiff's costs of this suit herein incurred, including any and all fees associated with this cause including any and all attorney fees under 42 U.S.C. 1988 (if attorneys are so retained for such cause);

5. Order Defendant Chicago Board of Education-CPS Chicago Public Schools to indemnify all Defendants- for any and all judgments entered in this cause;

6. Require and or Award such other and or additional relief that this Honorable Court deems just, equitable and proper.

## PURSUANT TO RULE 38 OF THE F.R.C.P

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,

*Kevin Sroga*

**Kevin Sroga**

Kevin Sroga
3343 W. Crystal
Chicago, IL 60651
(773) 401-2716

## AFFIDAVIT IN SUPPORT THERE OF –

I, Kevin Sroga, Plaintiff in the above titled of action hereby certify to everything that has been laid out and set forth in this complaint to be entirely accurately and truthful to the best of my personal knowledge under penalties of perjury prescribe by law.   X *Kevin Sroga*

Dated before me this 28th Day of March 2011.

X *Kevin Sroga*

Respectfully submitted,

*Kevin Sroga*

**Kevin Sroga**

Subscribed and sworn to before me
this 28th day of March 2011
at Chicago, County of Cook, State of Illinois.

Notary Public

"OFFICIAL SEAL"
SYLVANA THOMPSON
Notary Public, State of Illinois
My Commission Expires Aug. 23, 2014

54

KIMBALL & NORTH CURRENCY EXCHANGE
3401 W North Ave
Chicago, IL 60647
(773)772-2188
MON-WED 8:00AM - 9:00PM
THUR-FRI 8:00AM - 11:00PM
SAT 9:00AM - 6:00PM
SUN 10:00AM - 5:00PM

Monday, March 28, 2011 1:20:27 PM
--------------------------------------

Notary Public                           (1.00)
--------------------------------------

              Total Due:         1.00
         Amount Tendered:        1.00
            Change Due:          0.00

We Do Not Disclose Any Non-Public
Personal Information to Anyone, Except
             as Permitted by
                  Law.

             HR * 1164714